UNITED STATES of America, Plaintiff-Appellee,

v.

Shirley Jean ROWEN, Defendant-Appellant.

No. 78–5246.

United States Court of Appeals, Fifth Circuit.

April 26, 1979.

Michael S. Lee, Clyde R. Parks, James P. Finstrom, Dallas, Tex., for defendant-appellant.

Kenneth J. Mighell, U. S. Atty., Fort Worth, Tex., Shirley Baccus-Lobel, Robert C. Prather, Asst. U. S. Attys., Dallas, Tex., for plaintiff-appellee.

Before WISDOM, GOLDBERG and VANCE, Circuit Judges.

VANCE, Circuit Judge:

Shirley Jean Rowen was convicted of four counts of embezzling or stealing funds of the United States in violation of 18 U.S.C. § 641. The thefts involved four checks in a total amount of $1,688.00 made payable to nonexistent students with fictitious social security numbers.

Rowen worked as head cashier at El Centro College, one of the Colleges in the Dallas County Community College District. El Centro handles federal funds in connection with its participation in the Basic Educational Opportunity Grant (BEOG) program. The funds are disbursed by El Centro to students who have received awards from the Department of Health, Education and Welfare.

Under the BEOG program individual students apply directly to HEW for grants. HEW issues to each eligible student a paper known as a Student Eligibility Report, which is commonly referred to as an SER. Armed with the SER the student can then receive financial assistance provided he or she is enrolled in a participating college. The SER is presented to the college, where the student's enrolled status must be verified. Upon such verification a check is issued by the college acting as a disbursing agent for the program. On the basis of the SER the college is thereafter reimbursed by HEW.

During a compliance audit of El Centro's procedures it was found that a lack of segregation of duties in the cashier's office made it possible for the same person to initiate a check request and later reconcile the check after disbursement. A year-end audit revealed that the four checks in question had been issued in the names of the fictitious students and cashed at the college bookstore. There was no SER or other documentation which would have justified their issuance.

Rowen was the only cashier authorized to sign the check release forms. She had signed as the approving official on the check request form that had generated the checks. The government's handwriting expert testified that the endorsements on two of the checks were definitely written by Rowen and that she had probably endorsed the other two checks. Viewing the evidence as we must under *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) we conclude that it was clearly sufficient to support a verdict that Rowen stole the proceeds of the four checks.

I

Rowen contends, however, that the evidence was insufficient to support the jury's finding that the stolen monies were federal funds. She reasons that because no SERs were ever issued to the nonexistent student payees the government would make no reimbursement for the four checks and that there would be no involvement of federal funds. Under her view of the evidence, the money belonged to the Dallas County Community College District which will have to stand the loss.

The funds used by an educational institution in making BEOG payments to students are advanced by HEW to the institution. The applicable regulation provides that the amount of such advance will reflect the Commissioner of Education's estimate of the amount needed at that particular institution, 45 C.F.R. § 190.74 (1977). The funds are subject to withdrawal only on presenta-

tion of an SER. Although they are held by the disbursing institution the funds therefore continue subject to federal control with respect to each individual payment item.

HEW had provided the Dallas County Community College District with $1,996,258 in BEOG funds early in 1977 and prior to the thefts by Rowen. The funds were deposited into the Special Projects bank account which was account number 09–0162–9 at the Texas Bank and Trust Company in Dallas. All BEOG monies are put into that specific account as are funds received in connection with a number of other federal programs. The various funds are comingled in the one account, but are kept separate as a matter of record keeping. This procedure would appear to conform to the requirements of 45 C.F.R. § 190.79 (1977):

> (a) All funds received and disbursed by an institution under this part shall be handled through one identifiable account in accordance with generally accepted accounting procedures. Such account may be an existing account (preferably one maintained for Federal funds), provided adequate control ledgers are maintained to properly account for such funds separately from other funds. . . .

At the time that the checks in question were cashed, more than $1,996,258 in BEOG checks had been drawn against account 09–0162–9. HEW routinely adjusted the Dallas County Community College District BEOG funds by an increase to $2,232,574 on September 29, 1977, which was after the thefts.

The precise contention Rowen now makes can be divided into three parts: (1) that the checks in question were drawn against an already overdrawn BEOG account; (2) that HEW would never reimburse the amounts of those checks because there were no supporting SERs; and (3) that there was therefore no theft of federal funds.

The contention is flawed by the fact that the checks' proceeds were paid from account number 09–0162–9, which, as Rowen concedes, then contained federal funds. That the funds may have been on deposit in

connection with federal programs other than BEOG does not seem to be of importance. Nor do we view as controlling the fact that the college district will not be reimbursed and may ultimately bear the loss under its contract with HEW. Utilizing procedures under direct control of the federal government Rowen drew $1,688.00 from a bank account which contained funds of the United States. We read this court's holding in *United States v. Evans*, 572 F.2d 455 (5th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978), and that of the seventh circuit in *United States v. Maxwell*, 588 F.2d 568 (7th Cir. 1978) to require rejection of Rowen's contention. In *Maxwell* the court said that "the relevant inquiry becomes whether the federal government maintains a property interest in the funds in that account." *Id.* at 573. Our own analysis in *Evans* states,

> The key factor involved in this determination of federal interest is the supervision and control contemplated and manifested on the part of the government.

572 F.2d at 472.

While BEOG funds are being administered by a participating institution the federal government continues to exercise a high, perhaps the ultimate, degree of supervision and control. 45 C.F.R. § 190.79(b) (1977) specifies that the institution holds BEOG funds in trust. It is authorized to make payments only upon receipt from HEW of item-by-item authorizations. Our statement in *Evans* is equally applicable:

> Here the monies have a federal origin and a federal end, and during their outstanding circulation they are subject to extensive federal controls.

572 F.2d at 474.

The trial judge unequivocally instructed the jury that the federal character of the stolen funds was an essential element which the government was required to prove beyond a reasonable doubt. The character of the funds on deposit in account 09–0162–9 was not significantly altered by excessive BEOG withdrawals. The remaining funds against which these withdrawals were made were also federal. We conclude that the

evidence supported the jury's finding on this element of the offense.

## II

█ Rowen also argues that the district court erred in sentencing her to the penitentiary because she would not admit that she committed the offense. She contends that it is a due process violation to penalize her for refusing to plead guilty or admit guilt.

The basis of appellant's contention is the trial court's expression of regret that Rowen would not admit her guilt after the trial was over and she had been found guilty. The incident occurred during the sentencing proceedings.[1] Rowen received concurrent six months sentences on the first two counts and suspended sentences with five years probation on the remaining counts.

Consideration of this issue must begin with our reaffirmation of the principle that

the exercise by the sentencing court of its discretion cannot be questioned on appeal, except when arbitrary or capricious action amounting to a gross abuse of discretion is involved.

*United States v. Weiner,* 418 F.2d 849, 851 (5th Cir. 1969).

Rowen does not contend that the trial judge undertook to coerce a guilty plea by threat of a more severe sentence as was contended in *United States v. Herron,* 551 F.2d 1073 (6th Cir. 1977) on which she relies. Neither do we view the facts as being so extreme as those in *Thomas v. United States,* 368 F.2d 941 (5th Cir. 1966) where this court exercised its supervisory authority to require resentencing of a defendant who had received a maximum twenty-five year sentence after failing to respond to the trial court's exhortation that he "make a clean breast of this thing for once and for all." Rowen voluntarily testified on her own behalf and denied any guilt. The sentence she received was comparatively lenient.

As the factual issues developed in this case it was clear that either defendant was responsible for the issuance and cashing of the checks or someone else did it. The jury was confronted with questions in stark black and white. There were no shades of gray.

When the time came for sentence to be passed Rowen had been found guilty beyond a reasonable doubt on the basis of evidence that was clearly sufficient. The trial judge was not obliged to shut her mind to what she had seen and heard during the progress of the trial. The quest for just punishment under our system contemplates the contrary. The trial judge had heard Rowen testify in a manner that she deemed

---

1. The pertinent portion of the colloquy between the court, counsel and the defendant was as follows:

   THE COURT: You know, Mrs. Rowen, as I told you and as you know, I heard this case and I feel that you are guilty and I regret that you wouldn't admit it now that it's been tried, but you still won't admit it. I feel as if you likewise overstated the number of hours you worked at the place where you worked before and that you also were fired there for that. I would wish that you admit it, because I think that rehabilitation starts when people will admit things. In any event, I don't think that you will do anything like this again. Let's see what your lawyer has to say about you.

   MR. LEE: Your Honor, the Court is aware of the good background of the Defendant, her working record.

   THE COURT: An excellent background.

   MR. LEE: Thank you, Your Honor. And further that she does have a young baby and she has a good marriage and there is a tremendous amount of rehabilitation that she could achieve.

   THE COURT: Well, the trouble is that she is not rehabilitated. That is really the trouble. She won't admit it.

   MR. LEE: Well, yes, Your Honor. The Court may or may not be aware of the further investigation of this matter and at this time, there is not that much that can be said, but there is a continuing investigation on it and we would like the Court to consider that.

   THE COURT: Well, I consider everything.

   MR. LEE: Yes, Your Honor.

   THE COURT: Is there anything more that you want to say, Mrs. Rowen?

   MRS. ROWEN: Well, I would like to say that I hope that the Court will be lenient on me at this time.

   THE COURT: Well, I think that I am lenient; in fact, the probation officer thinks so to.

false, not only in respect to her denial of guilt but in other matters as well. She considered what she had heard in arriving at a sentence. This was not the only factor, she stated that she considered other things as well, but she made it quite clear that she considered it in connection with Rowen's potential for rehabilitation. We conclude that the trial judge was correct in doing so.

In *United States v. Nunn*, 525 F.2d 958 (5th Cir. 1976) this court expressed agreement with the analysis of Judge Marvin Frankel in *United States v. Hendrix*, 505 F.2d 1233, 1236 (2nd Cir. 1974), *cert. denied*, 423 U.S. 897, 96 S.Ct. 199, 46 L.Ed.2d 130 (1975):

> The effort to appraise "character" is, to be sure, a parlous one, and not necessarily an enterprise for which judges are notably equipped by prior training. Yet it is in our existing scheme of sentencing one clue to the rational exercise of discretion. If the notion of "repentance" is out of fashion today, the fact remains that a manipulative defiance of the law is not a cheerful datum for the prognosis a sentencing judge undertakes . . . . Impressions about the individual being sentenced . . . are, for better or worse, central factors to be appraised under our theory of "individualized" sentencing. The theory has its critics. While it lasts, however, a fact like the defendant's readiness to lie under oath before the judge who will sentence him would seem to be among the more precise and concrete of the available indicia.

*United States v. Nunn*, 525 F.2d at 961. Both *Nunn* and *United States v. Gamboa*, 543 F.2d 545 (5th Cir. 1976) clearly committed this court to the proposition that a trial judge's view as to whether a defendant had testified truthfully was one of the factors that could properly be considered in arriving at a sentence. Logical analysis of the theory of rehabilitation would argue that the rule could not be otherwise.

There was, however, a split among the circuits which took the issue to the Supreme Court in *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978).

Much of Mr. Justice Stewart's dissent supports the argument being advanced by Rowen. The majority, however, held to the contrary and speaking through Mr. Chief Justice Burger observed:

> A defendant's truthfulness or mendacity while testifying on his own behalf, almost without exception, has been deemed probative of his attitudes toward society and prospects for rehabilitation and hence relevant to sentencing. . . . Nothing we say today requires a sentencing judge to enhance, in some wooden or reflex fashion, the sentences of all defendants whose testimony is deemed false. Rather, we are reaffirming the authority of a sentencing judge to evaluate carefully a defendant's testimony on the stand, determine—with a consciousness of the frailty of human judgment—whether that testimony contained willful and material falsehoods, and, if so, assess in light of all the other knowledge gained about the defendant the meaning of that conduct with respect to his prospects for rehabilitation and restoration to a useful place in society.

*Id.* 98 S.Ct. at 2616, 2618.

We have considered the other contentions made by appellant but find that they are clearly without merit.

AFFIRMED.