**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Alga HOPE, Jr., Defendant–Appellant.**

No. 88–5099.

United States Court of Appeals,
Eleventh Circuit.

May 22, 1990.

Joseph S. Paglino, Miami, Fla. (court appointed), for defendant-appellant.

Dexter W. Lehtinen, U.S. Atty., and Richard Scruggs, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before HATCHETT and COX, Circuit Judges, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

A jury empaneled in the United States District Court for the Southern District of Florida convicted Alga Hope, Jr., of violating 18 U.S.C. § 371 by conspiring to commit an offense against the United States.[1]

---

1. Title 18 U.S.C. § 371 states:

 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

 If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor. The "offense against the United States" which Hope conspired to commit involved the violation of 18 U.S.C. § 641, which provides in part as follows:

 Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or

Hope appeals his conviction on various grounds. We affirm.

## FACTS

Hope organized the Economic Development Corporation of Dade County, Inc. ("EDCO"), a private non-profit Florida corporation, to administer an economic development program in Miami, Florida. This program utilized community development block grant funds provided to Dade County, a grantee, through the United States Department of Housing and Urban Development ("HUD"). *See* 42 U.S.C. §§ 5301 *et seq.;* 24 CFR §§ 570 *et seq.* Pursuant to the statutory and regulatory schemes, Dade County submitted an annual proposal to HUD outlining its development plans and requesting federal grant funds.[2] Upon its approval of the county's proposal, HUD made the funds available to Dade County via a line of credit with the United States Treasury Department.

EDCO operated in the Miami community, and it was to EDCO that interested individuals and organizations applied for the federal funds. When EDCO identified and approved an "eligible recipient," it sought the approved amount from Dade County. In theory, Dade County then would request that sum from the Treasury Department, and upon receipt of the funds, Dade County would disburse the money to EDCO for ultimate delivery to the approved recipient. However, the Treasury Department required that all funds "drawn down" in this manner be disbursed within three days or be returned to the department. To avoid the wasteful receipt and return of funds

thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

due to unforeseeable delays, Dade County chose to distribute funds requested by EDCO from its general account, and after doing so, to request the appropriate reimbursement from the Treasury Department.

In early 1984, EDCO approved a $38,000.00 loan to Essie Redmond for The Learning Development Center ("The Learning Center"), a day care facility in Liberty City.[3] EDCO prepared and submitted the loan package and a check request to Dade County, which in April of 1984 issued a $38,000.00 county check[4] jointly payable to EDCO and The Learning Center. After issuing the check, Dade County completed the appropriate paperwork and was reimbursed by the Treasury Department pursuant to the line of credit arranged by HUD. This check was issued to the Board of County Commissioners of Dade County, Florida, and it was deposited in the county's account.

The check issued by Dade County to EDCO and The Learning Center never was endorsed by Redmond or any other agent of the Center. Instead, the check, bearing the stamped endorsement of EDCO, was deposited on May 4, 1984, into EDCO's revolving loan account at Tropical Federal Savings and Loan Association ("Tropical").[5] The Learning Center received only $5,000.00. The remaining $33,000.00 was applied toward a $101,000.00 certificate of deposit purchased by EDCO on June 7, 1984, from Tropical. On the same day, EDCO used the certificate of deposit to collateralize a $101,000.00 line of credit at the same institution.

2. Dade County's proposals for the relevant years specifically identified EDCO as a beneficiary, or subgrantee, of the federal funds.

3. Liberty City is within the Miami metropolitan area.

4. This check bore a "VF number," a notation reflecting that the check was a federal voucher.

5. Just prior to these events Adrian Marin, Hope's codefendant in the conspiracy count and at the time of trial a fugitive from justice, appeared on the scene. Marin met with Hope at EDCO several times between March and July of 1984.

On July 5, 1984, EDCO utilized its line of credit at Tropical to purchase a $60,000.00 certificate of deposit from the Trust Bank. Some two weeks later, on July 19th, EDCO obtained a $60,000.00 line of credit from the Trust Bank using the $60,000.00 certificate of deposit as security.

In the middle of July, EDCO received a bank statement from Tropical reflecting a $38,453.23 withdrawal from EDCO's account. Hope met with EDCO employees Darryl Gorham (vice president for administration and operations), Persephone Taylor (supervisor of administration and finance) and Cassandra Smith (chief accountant), and he expressed concern that the auditors [6] would discover his diversion of this $38,000.00 earmarked for The Learning Center and his application of a portion of those funds towards the purchase of certificates of deposit and the establishment of the lines of credit. Hope asked Smith to restructure the bank statement from Tropical to eliminate the withdrawal. Smith did not complete the task.

On July 27, 1984, Hope and EDCO employee Gorham went to the Trust Bank where they met Marin. The three men retired to an office in the bank building where Marin solicited a loan for his corporation, ATJ Industries, Inc. Despite Gorham's objections about the absence of appropriate loan documents, Hope sent for EDCO's checkbook, and upon its arrival, he wrote a $30,000.00 check payable to ATJ Industries.[7] The check was drawn upon EDCO's Trust Bank account.[8]

A short time later, Smith and Taylor discovered that a check had been written on EDCO's account without the appropriate documentation. Smith sought documentation from Gorham, who referred her to Hope. Both Smith and Gorham repeatedly attempted to procure the proper proof from Hope to support this check, which turned out to be the $30,000.00 paid to ATJ Industries. On or about August 11th, Jackie Simmer, a secretary for attorney William Calvo, prepared documents for a loan to ATJ Industries at the request of Marin. Hope appeared at EDCO with these documents some time later, and he instructed Taylor, a notary public, to notarize the signatures of Hope and Marin, who was not present, and to backdate the notarization to July 27, 1984, the date of the check. Taylor complied with this direction. The loan documents identified 100,000 shares of penny stock in the Candy Mountain Gold Mine as dubious security for the loan to ATJ Industries.

Eventually, EDCO's lines of credit at Trust Bank and Tropical came due. EDCO was unable to pay, and the certificates of deposit were forfeited. A federal grand jury indicted Hope in two counts of a three count indictment on November 20, 1986. In the count primarily concerned with this appeal, Hope and Marin were charged with violating 18 U.S.C. § 371 by conspiring to embezzle, steal, purloin and convert to their own use over $100.00 in United States funds, in violation of 18 U.S.C. § 641.

### DISCUSSION

█ The main thrust of Hope's appeal is that in light of *Tanner v. United States*,[9] and *United States v. Hope* ("*Hope I*")[10] the indictment here does not properly charge a violation of 18 U.S.C. § 371. Section 371 describes two different offenses: (1) a conspiracy to defraud the United States; and (2) a conspiracy to commit any

---

**6.** Dade County's internal auditors were conducting an ongoing audit of EDCO.

**7.** Gorham co-signed the check.

**8.** Marin allegedly paid personal expenses with the $30,000.00. Included among the checks drawn on ATJ Industries' account was a check signed by Marin and made payable to Hope in the amount of $5,000.00. This $5,000.00 was the focus of a second count against Hope in which the government alleged that Hope stole $5,000.00 in federal funds in violation of 18 U.S.C. § 641. The jury acquitted Hope of this charge.

**9.** 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987).

**10.** 861 F.2d 1574 (11th Cir.1988). *Hope I* charged the same defendant presently before us on appeal, and the case involved allegations of diverted funds similar to the allegations in the instant case.

offense against the United States. *See Hope I,* 861 F.2d at 1578; *United States v. Haga,* 821 F.2d 1036 (5th Cir.1987); *see also Dennis v. United States,* 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) (two clauses in section 371 are alternative clauses). "The Supreme Court in *Tanner* explained that the conspiracies criminalized by section 371 are defined by the target of the conspiracy." *Hope I,* 861 F.2d at 1578. *Tanner* and *Hope I* both make clear that when proceeding pursuant to the "to defraud" clause, the indictment must allege and the proof must show that the object of the conspiracy was to defraud the United States or one of its agencies or departments. While acknowledging that the fraud may be accomplished either directly or indirectly by causing a third party to perpetrate the fraud, the Supreme Court declined the government's invitation to include within the scope of the statute conspiracies to defraud an intermediary performing official functions on behalf of the federal government. *Tanner,* 483 U.S. at 130–32, 107 S.Ct. at 2752–53, 97 L.Ed.2d at 111–13. Thus, in *Hope I,* the indictment was insufficient because it identified as the targets or objects of the conspiracy certain agencies and officials of Dade County. Nowhere in the indictment did the government identify any United States agency or department as either the object of the conspiracy or the target of any overt act. Moreover, by explicitly identifying county agencies as the ultimate targets of the conspiracy, the government precluded itself from introducing evidence that the United States was directly or indirectly the conspiracy's target. To permit the introduction of such evidence would result in a fatal variance from the language of the indictment. *Hope I,* 861 F.2d at 1577–78.

In *Hope I,* the government argued that the indictment was sufficient because it alleged as a second, independent object of the conspiracy the violation of 18 U.S.C. § 1001. The panel noted that "[a] conspiracy to commit 'any offense' against the United States (here a § 1001 offense) is as much a violation of § 371 as is a conspiracy to defraud the United States." *Id.* at 1578. Emphasizing that the holding in *Tanner*

applied with equal force to both clauses of section 371, the panel again relied upon the concept of "variance" and rejected the government's argument.

> Again, by specifically referring to county departments and agencies as the targets of the conspiracy, to the exclusion of departments or agencies of the United States, the overt acts section of the indictment precludes the Government from presenting evidence as to a § 371 conspiracy, no matter what its object. To permit the Government to do so would allow the possibility that the defendant could be convicted of an offense with which he had not been charged.

*Id.* at 1578.

Here, the government has avoided the errors identified in *Tanner* and *Hope I.* Proceeding under the "commit any offense" clause, the government alleged in the indictment that Hope and Marin conspired to embezzle, steal, purloin and convert to their own use funds of the United States exceeding one hundred dollars, in violation of 18 U.S.C. § 641. The indictment alleged that Hope diverted federal funds from HUD which were intended for loans to minority owned businesses and that Hope utilized the funds to purchase certificates of deposit and arrange lines of credit. The indictment also alleged that the lines of credit were used to make an unauthorized loan to ATJ Industries and that Hope and Marin shared the proceeds of that unauthorized loan.

The indictment here specifically alleges that the object of the section 371 conspiracy was to commit the offense proscribed by section 641, the embezzlement or theft of federal funds, and the indictment specifically identifies the source of those funds as HUD and therefore as federal funds. The government's proof during the trial proceeded on that basis, thereby avoiding the problem of variance evident in *Hope I.* The indictment adequately charges Hope with a violation of section 371.

■ Having concluded that the government sufficiently alleged a violation of section 371 in the indictment, we turn next to

whether the funds advanced to EDCO and The Learning Center from Dade County's general account and subsequently diverted by Hope can be deemed "federal funds." Though Hope maintains the contrary, we hold that funds so advanced are federal in nature.

In *United States v. Smith*, 596 F.2d 662 (5th Cir.1979),[11] the Fifth Circuit Court of Appeals had the occasion to consider whether federal funds placed in a college's general revenue account, subsequently transferred to a college work-study account before disbursal to eligible student recipients and ultimately stolen from this account were federal funds. The court stated that "the pertinent inquiry is when such funds lose their federal character." *Id.* at 664. The court drew one bright line: "when an outright grant is paid over to the end recipient, utilized, commingled or otherwise loses its identity, the money in the grant ceases to be federal." *Id.* (citations omitted). The court held that "while identifiable funds appropriated for use in a federal program are in transit between their federal source and their intended recipient and are still subject to substantial federal controls, they remain federal funds." *Id.* at 669; *see also Hayle v. United States*, 815 F.2d 879 (2d Cir.1987) (federal grant money remains federal money even after being deposited in grantee's bank account and even if commingled with non-federal funds so long as the government exercises supervision and control over the funds and their ultimate use).

Our inquiry is whether identifiable funds advanced by a HUD grantee (Dade County) to a subgrantee (EDCO) in anticipation of immediate federal reimbursement for purposes governed by and subject to federal statutes and regulations can be considered federal funds when those funds are diverted by the sub grantee prior to their delivery to the end recipient (The Learning Center). Hope answers that question negatively by focusing narrowly on the Dade Coun-

ty check. Such a limited view ignores reality.

Hope formed EDCO as a private, non-profit corporation to serve as a conduit for money originating in HUD's community development block grant program. That money is available to and is earmarked for Dade County pursuant to the county's annual proposal to HUD, a proposal identifying EDCO as a recipient of and a channel for the distribution of the federal funds. Individuals and organizations applying through EDCO for such funds must meet eligibility requirements established by federal law and regulations. When EDCO approves an organization's loan application, it submits the loan package to Dade County in anticipation of receiving the earmarked funds via Dade County's line of credit with the United States Treasury Department. The monies received can be applied only toward eligible activities, and those funds may not be diverted at any time into interest bearing accounts. Nor can the funds be used for the benefit of another loan applicant. Grantees and subgrantees are required to repay to the federal government funds misappropriated or misapplied.

Pursuant to this federally established framework, The Learning Center applied for, and was approved for, a $38,000.00 loan. The Learning Center never received $33,000.00 of that approved loan because Hope improperly diverted those funds first into interest bearing accounts, then into lines of credit and finally into the coffers of ATJ Industries. The avenue by which those funds were to travel was clearly federal. That Dade County chose to accelerate the delivery by advancing the funds from its general account does not alter their federal character. *See United States v. Brown*, 742 F.2d 359 (7th Cir.1984) (funds defendant sought to convert by cashing checks on CEDA account, an operator of programs for the disadvantaged as a subgrantee of Cook County, Illinois, which in turn was a grantee of HUD, were

---

**11.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

federal funds pursuant to the accountability both of the subgrantee to the grantee and of the grantee to grantor HUD for proper disbursement of block grants funds intended for federally sanctioned purposes).

■■■ To convict Hope of a felony, the government was required to establish beyond a reasonable doubt that the value of the embezzled, stolen or converted monies exceeded $100.00. 18 U.S.C. §§ 641, 371; *United States v. Jeter*, 775 F.2d 670, 679 (6th Cir.1985); *United States v. DiGilio*, 538 F.2d 972, 978 (3d Cir.1976), *cert. denied sub nom. Lupo v. United States*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). Hope contends that the value of the funds diverted is an essential element of a felony offense, that the court failed to instruct the jury of its obligation to determine value and that this alleged failure by the court precludes the finding necessary to convict Hope of a felony and requires that we reverse his conviction.

Hope did not object to this purported deficiency in the trial court's instructions. Therefore, we review his assignment of error under the "plain error" standard of review. *United States v. Solomon*, 856 F.2d 1572, 1574 (11th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1352, 103 L.Ed.2d 820 (1989). Plain errors are obvious and substantial errors which seriously affect the fairness, integrity or public reputation of judicial proceedings. *Id.* Considering as we must the jury instructions as a whole, *id.*, we conclude that Hope's argument is without merit.

Count one of the indictment alleged, and the trial court's instructions made clear,

that Hope had conspired in violation of section 371 to embezzle, steal or convert money belonging to the United States, a violation of section 641. In instructing the jury on count one, the court read a portion of section 641, though it omitted at that time any mention of the value requirement. After thoroughly explaining to the jury the meaning of conspiracy, the court addressed again, in terms of count two of the indictment, the elements constituting a violation of section 641. On at least three occasions the district court informed the jury of the requirement that the value of the money embezzled, stolen or converted must exceed $100.00. While the instructions could have been clearer, an examination of the instructions as a whole leads to the conclusion that the instructions as given do not amount to plain error.[12]

■■■ Hope next asserts that the government presented insufficient evidence to convict him of a violation of section 371. As part of this argument, Hope claims that the overt acts identified by the government were inadequate to establish his intent and that those acts were improperly considered in that they occurred either prior to or after the life of the alleged conspiracy.

The evidence in a criminal case need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence." *United States v. Sanchez*, 722 F.2d 1501, 1505 (11th Cir.1984), *quoting United States v. Bell*, 678 F.2d 547,

---

**12.** That the jury acquitted Hope of count two does not alter our conclusion. First, that a jury reaches what might be construed as inconsistent verdicts is not an adequate ground for reversal. *See United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). Second, the evidence at the trial created a reasonable doubt both as to whether Hope received the $5,000.00 check which was the subject of count two and as to whether he cashed that check if received. That acquittal in no way undermined the evidence adduced to establish Hope's participation

in the conspiracy to embezzle or misappropriate the $33,000.00 that was not paid to The Learning Center.

Hope also claims that the district court erred in refusing to give certain requested jury instructions. Having reviewed the instructions in their entirety, we conclude that the district court adequately charged the jury as to the applicable law and properly presented the issues to the jury. The district court did not commit reversible error in declining to give Hope's requested instructions.

549 (5th Cir. Unit B 1982) (*en banc*), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). An appellate court views the evidence in the light most favorable to the government and accepts reasonable inferences and credibility choices made by the factfinder. *Sanchez*, 722 F.2d at 1505, *citing Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and *United States v. Gonzalez*, 719 F.2d 1516, 1521–22 (11th Cir.1983). To sustain Hope's conviction on the conspiracy count, we look to whether "the government proved beyond a reasonable doubt that the appellants had 'deliberate, knowing, specific intent to join the conspiracy.'" *United States v. Cole*, 755 F.2d 748, 754 (11th Cir.1985), quoting *United States v. DeSimone*, 660 F.2d 532, 537 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982). In doing so, we note that "participation in a conspiracy need not be proved by direct evidence; it

may be inferred from the actions of the accused or by circumstantial evidence of a scheme." *United States v. Carter*, 760 F.2d 1568, 1582 (11th Cir.1985), citing *Cole*, 755 F.2d at 755.

The government presented detailed evidence, both direct and circumstantial, of Hope's participation in a scheme to embezzle, steal or convert community development block grant funds delivered to EDCO for ultimate delivery to various organizations, including The Learning Center.[13] The evidence showed that Hope had numerous meetings with Marin and that concurrent with such meetings and in contravention to the applicable regulations he purchased certificates of deposit and established lines of credit at various banks. The government also proved that Hope wrote Marin a $30,000.00 check on EDCO's account in the absence of appropriate documentation and that he acted to legitimize his conduct as the scheme unraveled.[14]

---

**13.** Hope alleges two errors related to the government's presentation of this evidence, both of which are without merit. First, he contends that the district court erred when it denied his motion for a mistrial based upon the allegedly irrelevant and prejudicial testimony of George Mello, who, prior to his testimony, had been an owner of a Miami based architectural company. Mello's company had received federal funds through a loan approved by EDCO, and he testified about his company's relationship with EDCO and Hope and admitted to pleading guilty to one count of misuse of government funds. Evidence showed that these funds were commingled in the relevant bank accounts with those designated for The Learning Center and that from the proceeds of this activity Hope wrote the $30,000.00 check to ATJ Industries. The district court exercises broad discretion on evidentiary matters. *See United States v. Champion*, 813 F.2d 1154, 1172 (11th Cir.1987). We find no clear abuse of that discretion with respect to the admission of Mello's testimony. Consequently, the court did not abuse its discretion in denying Hope's motion for a mistrial based thereon. *See United States v. Blanton*, 793 F.2d 1553, 1565 (11th Cir.1986) (motion for mistrial reviewed for abuse of discretion).

Second, Hope claims that the district court erred in refusing to appoint as an expert witness, under 18 U.S.C. § 3006A, a certified public accountant to assist in his defense. Hope based this motion on the government's extensive use of accountants to establish the diversion of federal funds. Hope has failed to establish a violation of the rule's procedural requirements. He

has also failed to establish by clear and convincing evidence that the denial of his motion was prejudicial to his defense. *See United States v. Perrera*, 842 F.2d 73, 77 (4th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 102, 102 L.Ed.2d 77 (1988); *United States v. Reddick*, 620 F.2d 606 (7th Cir.1980).

**14.** Hope's assertions that the government improperly alleged and produced evidence of overt acts which occurred prior to and after the life of the conspiracy are also without merit. The government alleged the life of the conspiracy to be "[f]rom in or about June, 1984 to in or about August, 1984...." ROA Record Excerpts, Indictment at p. 2. All of the overt acts identified in the indictment occurred during those months. Occurrences prior to June, though introduced into evidence at the trial to complete the story of this conspiracy, were not alleged as overt acts. Contrary to Hope's strenuous objection, the government's inclusion as an overt act the events of August 11th, the falsified notarization at Hope's direction of the loan documents, was not improper. Rather than a "cover-up," that falsification constitutes the final act in furtherance of Hope's scheme to embezzle federal funds. This becomes obvious when we consider that the documents were backdated to July 27, 1984, the date on which Hope wrote the check to Marin and a date clearly within the life of the alleged conspiracy. *See Grenewald v. United States*, 353 U.S. 391, 405, 77 S.Ct. 963, 974, 1 L.Ed.2d 931, 944 (1957) (repainting a stolen car is in furtherance of conspiracy to steal).

Viewing this evidence in the light most favorable to the government, we conclude that a reasonable trier of fact could have found that Hope was involved in the alleged conspiracy.

 Finally, Hope seeks to overturn his conviction because of alleged grand jury improprieties. Specifically, he contends that the Justice Department's appointment as special federal grand jury agents the Dade County auditors who previously had audited EDCO and who had recommended civil and criminal action against Hope was improper in that these agents were biased and had prejudged the case. In support, however, Hope offers only innuendos of complicity between the government and the special agents and allegations of misconduct on the part of the special agents. Hope offers nothing which indicates that the independence of the grand jury has been usurped, that its integrity has been impugned, or that his rights have been infringed. *See United States v. Kilpatrick*, 821 F.2d 1456, 1468 (10th Cir.1987), *aff'd on other grounds sub nom., The Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), citing *United States v. Phillips*, 664 F.2d 971 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). We refuse, on these facts, to invade the traditionally private province of the grand jury.

For the foregoing reasons the judgment of conviction is AFFIRMED.